# United States Court of Appeals for the Federal Circuit

---

**EDDIE N. DELA CRUZ,**
*Claimant-Appellant*

**v.**

**ROBERT WILKIE, SECRETARY OF VETERANS AFFAIRS,**
*Respondent-Appellee*

---

2018-2101

---

Appeal from the United States Court of Appeals for Veterans Claims in No. 17-1020, Judge Coral Wong Pietsch.

---

Decided: July 26, 2019

---

SETH ALAIN WATKINS, Watkins Law & Advocacy, PLLC, Washington, DC, argued for claimant-appellant. Also represented by LOUIS STEFAN MASTRIANI, Adduci, Mastriani & Schaumberg, LLP, Washington, DC.

MARTIN F. HOCKEY, JR., Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent-appellee. Also represented by JANA MOSES, JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., LOREN MISHA PREHEIM; BRIAN D. GRIFFIN,

BRANDON A. JONAS, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

———————————

Before DYK, REYNA, and WALLACH, *Circuit Judges.*

DYK, *Circuit Judge.*

Eddie Dela Cruz appeals from the decision of the Court of Appeals for Veterans Claims ("Veterans Court") affirming the denial of his claim for a one-time payment from the Filipino Veterans Equity Compensation Fund ("compensation fund"). The Department of Veterans Affairs ("VA") denied his claim because the Army certified that Mr. Dela Cruz did not have service as a member of the Philippine Commonwealth Army, including recognized guerillas, as "he was not listed in the Reconstructed Guerilla Roster" ("reconstructed roster"). J.A. 5.

We hold that the VA can generally rely on the service department's determination in deciding eligibility for payment from the compensation fund. But, in this context, the VA cannot rely on the service department's determination that the veteran is not on the reconstructed roster without giving the veteran a meaningful opportunity to challenge his service record. Dela Cruz's proper avenue for relief is to seek a correction of his service record from the Army Board for Correction of Military Records ("Corrections Board"). The government has represented that the Corrections Board will consider such an application. We affirm-in-part and remand to the Veterans Court to hold the case in abeyance pending consideration by the Corrections Board.

BACKGROUND

I

On July 26, 1941, President Franklin D. Roosevelt issued an Executive Order to "order into the service of the armed forces of the United States . . . all of the organized

military forces of the Government of the Commonwealth of the Philippines." Military Order: Organized Military Forces of the Government of the Commonwealth of the Philippines Called Into Service of the Armed Forces of the United States, 6 Fed. Reg. 3,825, 3,825 (July 26, 1941). At the time, the Philippines was a territory of the United States. As a result of the Executive Order, a variety of Filipino military organizations—the regular Philippine Scouts, the new Philippine Scouts, the Guerrilla Services, and more than 100,000 members of the Philippine Commonwealth Army—served the United States during World War II. *See* ARRA § 1002(a)(3).

After the war ended, however, Congress passed legislation—the First Supplemental Surplus Appropriation Rescission Act of 1946, 38 U.S.C. § 107(a) and Second Surplus Appropriation Rescission Act of 1946, 38 U.S.C. § 107(b) (collectively, "the 1946 Rescissions Acts")—providing that service in these Filipino military organizations "shall *not* be deemed to have been active military, naval, or air service." *Id.* § 107(a), (b) (emphasis added). As a result, after the passage of this legislation, Filipino veterans were not eligible for the same benefits as the United States veterans they served with during World War II. Instead, the 1946 Rescissions Acts made them eligible only for certain benefits, often at reduced rates. *See* ARRA § 1002(a)(6)–(8) (describing these reduced benefits).

In 2009, Congress enacted Section 1002 of the American Recovery and Reinvestment Act of 2009 ("ARRA"), Pub. L. No. 111–5, 123 Stat. 115, 200–02 (2009), which established a $198 million fund to provide one-time payments to Filipino veterans who were excluded from full veterans benefits by the 1946 Rescissions Acts. *Compare* ARRA § 1002(d)(1)(A) (defining an "eligible person" for purposes of receiving the one-time payment) *with* 38 U.S.C. § 107. The one-time payment is $15,000 for U.S. citizens and $9,000 for non-citizens. ARRA § 1002(e). The statute

required Filipino veterans to apply for this payment within one year of the statute's enactment. *Id.* § 1002(c)(1).

## II

Although many Filipino veterans have received payments under this statute, many have not.[1] This is in part due to the VA's requirement that the relevant service department (such as the Army) verify the veteran's service. For many decades, the VA has required that all veterans applying for benefits establish their service in one of two ways: (1) the veteran can submit a "document issued by the service department," 38 C.F.R. § 3.203(a); or (2) the VA will request "verification of service from the service department," *id.* § 3.203(c). "[T]he VA has long treated the service department's decision on such matters as conclusive and binding on the VA," regardless of whatever other evidence documenting service the claimant provides to the VA. *Soria v. Brown*, 118 F.3d 747, 749 (Fed. Cir. 1997). In *Soria*, for example, the claimant applied for the reduced benefits discussed above based on his service in the Philippine Commonwealth Army, but the U.S. Army refused to certify his service. *Id.* at 748. The VA denied benefits based on the Army's determination. *Id.* This court affirmed, explaining that there was "no error" in treating the service department's determination as conclusive, and noting that the proper "recourse lies within the relevant service department, not the VA." *Id.* at 749.

---

[1]    As of January 1, 2019, the VA has granted 18,983 claims for payment from the compensation fund and denied 23,772 claims. *See* U.S. Dep't of Veterans Affairs, *WWII Filipino Veterans Equity Compensation (FVEC) Fund*, https://www.va.gov/centerforminorityveterans/fvec.asp (last visited July 24, 2019).

## III

As relevant here, for claims based on Philippine service in World War II, the appropriate "service department" is the U.S. Army. To verify the service of a Filipino guerrilla, the Army relies on the reconstructed roster and treats the roster as authoritative. *See Filipino Veterans Equity Compensation Fund: Examining the Department of Defense and Interagency Process for Verifying Eligibility: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Armed Servs.*, 113th Cong. 9 (2014) [hereinafter *Oversight & Investigations Subcomm. Hearing*] (Statement of Scott Levins, Director, Nat'l Personnel Records Ctr., Nat'l Archives & Records Admin.) ("[T]he roster is the definitive source."). If an individual's name does not appear on the reconstructed roster, the Army will refuse to verify service.[2] Moreover, as explained above, the VA in turn treats the Army's determination of service as conclusive and binding. The result of this is that a Filipino veteran who does not appear on the reconstructed roster will not receive payment from the compensation fund.

The problem is that the reconstructed roster is not always accurate. This is the result of the methodology employed to create the reconstructed roster. According to a 1949 Army report, many of the original rosters for Filipino units were lost, destroyed, or tampered with. *See* Dela Cruz Op. Br. Addendum at 20–21. After the war ended, "hundreds of unit rosters were missing," some sets of rosters "were being tampered with," "a number of guerillas had been processed and paid but no records existed of their having been recognized," and "no one interested agency possessed a complete set of rosters." *Id.* at 20. Thus, the

---

[2] The Army also requires a Form 23 affidavit, such as the one it had in its files for Dela Cruz, though the affidavit is not sufficient by itself. *See Oversight & Investigations Subcomm. Hearing* at 9.

Army embarked on a reconstruction project to attempt to create one authentic roster of Filipino guerrillas who served during World War II.

To create the reconstructed roster, the Army first decided which guerrilla units to include in the roster, based on information received from the units themselves, military orders, combat histories of the U.S. units that fought alongside the Filipino units, and so on. Then, if the Army decided that a particular guerrilla unit merited inclusion in the roster, it requested a roster from the unit commander. If the roster appeared to be free of anomalies, it was then authenticated for inclusion in the reconstructed roster. Since completing the reconstructed roster in 1948, the Army has followed a policy prohibiting any changes or corrections to the roster. *See Oversight & Investigations Subcomm. Hearing* at 3–4 (Statement of Brigadier Gen. David K. MacEwen, The 59th Adjutant Gen. of the U.S. Army, Dep't of the Army); Dela Cruz Op. Br. Addendum at 1 (1974 Memorandum from Howard H. Callaway, Secretary of the Army).

Representatives of the VA and the Army have acknowledged the potential for inaccuracies in the reconstructed roster at Congressional hearings relating to payments to Filipino veterans from the compensation fund. At one hearing, a VA Senior Advisor for Compensation agreed that it would not be unreasonable to think that there are eligible individuals who "didn't make it on the list," given that the reconstructed roster was created "in postwar Philippines, after a country has been ravaged by combat for 4 years." *Filipino Veterans Equity Compensation Fund: Inquiry Into the Adequacy of Process in Verifying Eligibility: Hearing Before the Subcomm. on Disability Assistance and Mem'l Affairs of the H. Comm. on Veterans' Affairs*, 113th Cong. 12 (2014) (Statement of Brad Flohr, Senior Advisor for Compensation, Veterans Benefits Admin., Dep't of Veterans' Affairs). At the same hearing, Brigadier General MacEwen testified on behalf of the Army he did not "doubt

that there are plenty of people that served honorably, patriotically" but that may have been excluded from the roster if it was determined at the time that their role did not "r[i]se to the level of qualifying service." *Id.* (Statement of Brigadier Gen. David K. MacEwen, The 59th Adjutant Gen. of the U.S. Army, Dep't of the Army). Moreover, at a hearing before the House Subcommittee on Oversight and Investigations to the Committee on Armed Services, Chairman Heck noted that "it certainly is possible that individuals who served honorably in a recognized guerrilla unit may have been omitted from the reconstructed roster," such as if the individual simply "missed the time when the rosters were reconstructed." *Oversight & Investigations Subcomm. Hearing* at 12 (statement of Rep. Joseph J. Heck, Chairman, Subcomm. on Oversight & Investigations).

## IV

Contending that he served in the Filipino guerilla forces during World War II, Dela Cruz timely applied for payment from the compensation fund. To show that he served in the Filipino guerrillas, Dela Cruz submitted an affidavit describing his service (the "Form 23 affidavit"), which he executed at the end of World War II in front of a U.S. Army captain. He also provided a certification from the Armed Forces of the Philippines, which certified his service in a Filipino guerrilla unit. In addition, Dela Cruz submitted affidavits by his brother, his wife, his brother-in-law, and his neighbor (who stated that he served in the Filipino guerrillas together with Dela Cruz). Notably, as the Board of Veterans' Appeals ("BVA") recognized, Dela Cruz has been deemed eligible to receive healthcare from the VA, which requires veteran status, based on an affidavit from the Philippine Army.

The Department of Veterans Affairs Regional Office ("RO") denied Dela Cruz's claim for payment because it determined that he did not establish his service. It concluded

that none of the affidavits and supporting documentation Dela Cruz submitted qualified as documents of the service department. *See* 38 C.F.R. § 3.203(a). The RO therefore requested the service department, the Army, to verify Dela Cruz's service. *See id.* § 3.203(c). The Army, in turn, certified "that Mr. Dela Cruz did not have service as a member of the Philippine Commonwealth Army, including the recognized guerillas," as "he was not listed in the Reconstructed Guerilla Roster." J.A. 5. Although the Army did have Dela Cruz's Form 23 affidavit—the affidavit Dela Cruz executed in front of an Army captain in which he described his service in the Filipino guerillas—in its own files, the Army indicated that it was unable to verify the accuracy of Dela Cruz's statements of service and, in any event, was "not able to accept affidavits to verify service." J.A. 131. After multiple appeals and remands, the BVA and Veterans Court affirmed the denial of payment. The Veterans Court reasoned that the Army was "not able to verify that Mr. Dela Cruz had service" and that the service department's determination as to service is "conclusive and binding" on the VA. J.A. 8.

Dela Cruz appeals. We have jurisdiction under 38 U.S.C. § 7292(c). We review legal determinations of the Veterans Court de novo. *Goodman v. Shulkin*, 870 F.3d 1383, 1385 (Fed. Cir. 2017).

DISCUSSION

I

At its core, Dela Cruz's argument is that the VA should have made its own determination as to Dela Cruz's service and thus his eligibility for payment. We rejected a similar argument in *Soria*. 118 F.3d at 749. As noted earlier, before the compensation fund was established, Filipino veterans were only eligible for reduced benefits. In *Soria*, a Filipino veteran applied for these reduced benefits, but the VA denied his claim because the Army "refused to certify Mr. Soria's service." *Id.* at 748. We explained that under

38 C.F.R. § 3.203, an applicant for veterans' benefits must prove service "with either official documentation issued by a United States service department or verification of the claimed service by such a department." *Id.* We noted that "the VA has long treated the service department's decision on such matters as conclusive and binding on the VA" and held that there was "no error in that treatment." *Id.* at 749. We further explained that if the service department's refusal to verify service is in error, the proper "recourse lies within the relevant service department, not the VA." *Id.; see also Go v. Shinseki*, 517 F. App'x 941, 942 (Fed. Cir. 2013) (holding that under *Soria*, the VA may apply 38 C.F.R. § 3.203(c) to claims for payment from the compensation fund, and that the applicant's "avenue for relief" is to "file a request to 'correct' his military service record" with the service department).

Dela Cruz contends that *Soria* is distinguishable because it did not involve benefits under ARRA § 1002. According to Dela Cruz, § 1002 is remedial legislation that must be construed broadly to effectuate its purpose. Further, he argues that limiting payment only to those Filipino veterans whose service is verified by the applicable service department under 38 C.F.R. § 3.203(c) would be inconsistent with the statute because the statute's definition of "eligible person" does not include a requirement of service department verification.[3] The government agrees that

---

[3] In relevant part, ARRA § 1002(d)(1)(A) defines an "eligible person" as "any person" who served

before July 1, 1946, in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941, including among such military forces organized guerrilla forces under commanders

ARRA § 1002 is remedial legislation, but responds that even so, requiring service department verification is consistent with the statute.

We agree with the government that the remedial purpose and language of § 1002 do not foreclose the VA from requiring service department verification similar to that required under 38 C.F.R. § 3.203(c). The statute expressly provides that an application for payment "shall contain such information and evidence as the Secretary may require," ARRA § 1002(c)(1), and 38 C.F.R. § 3.203 simply specifies the information required to establish service for all veterans seeking benefits. The remedial purpose of ARRA § 1002 cannot overcome its plain language, which allows the VA to prescribe what information and evidence is required to apply for payment from the compensation fund. Moreover, the language in § 1002 is similar to the general statutory grant of authority to the VA to prescribe "regulations with respect to the nature and extent of proof and evidence and the method of taking and furnishing them in order to establish the right to benefits" administered by the VA. 38 U.S.C. § 501(a)(1). Had Congress sought to create an exception in ARRA § 1002 to the VA's longstanding regulatory requirement for proving service or to limit the VA's authority to prescribe such regulations, it could have expressly done so—but it did not.

---

appointed, designated, or subsequently recognized by the Commander in Chief, Southwest Pacific Area, or other competent authority in the Army of the United States.

This definition is identical to the provision in the 1946 Rescissions Acts defining who is deemed *not* to have qualifying service and therefore cannot obtain the full range of veterans' benefits. *See* 38 U.S.C. § 107(a).

Dela Cruz also argues that even if the VA is permitted to require service department verification in the context of ARRA § 1002, it misapplied that requirement by not accepting Dela Cruz's Form 23 affidavit as a "document issued by the service department." 38 C.F.R. § 3.203(a)(1). To be sure, the Form 23 itself was prepared by the Army in 1945 before it was executed by Dela Cruz. In addition, the Form 23 affidavit as executed by Dela Cruz has indicia of reliability because it was executed under penalty of military courts-martial through the then-governing Articles of War. Nevertheless, in establishing service, the Army treats the reconstructed roster—not Form 23—as the "definitive source," *see Oversight & Investigations Subcomm. Hearing* at 9, instead using Form 23 primarily as a check for consistency against the roster, *see id.* The Army was unable to locate Dela Cruz's name on the reconstructed roster, and thus under its approach was unable to verify the accuracy of his Form 23 affidavit. J.A. 131. The VA's decision to treat the roster as the "document issued by the service department," 38 C.F.R. § 3.203(a)(1), was not arbitrary and capricious. The Board therefore did not err in not accepting Dela Cruz's Form 23 affidavit alone as establishing service.

For the first time, Dela Cruz argues on appeal that requiring service department verification to receive payment from the compensation fund violates the Equal Protection Component of the Due Process Clause of the Fifth Amendment. Under the circumstances, we decline to consider this argument which was not raised at any point in the proceedings below. *See Forshey v. Principi*, 284 F.3d 1335, 1355–58 (Fed. Cir. 2002) (en banc), *superseded in part by statute on other grounds*.

## II

Dela Cruz alternatively argues that the VA cannot give conclusive weight to an Army determination that relies solely on the reconstructed roster without giving the

veteran a meaningful opportunity to challenge his service record. However, the VA maintains that the proper remedy for this lies with Corrections Board, not the VA, because only the Corrections Board has the "legal authority to amend or correct an official military record." Gov't Br. at 36. Thus, contends the VA, "a dispute concerning determinations as to whether a claimant served in the military is properly directed" to the Corrections Board. *Id.* at 37. The applicable statute, 10 U.S.C. § 1552(a)(1), provides that the Corrections Board, acting on behalf of the Secretary of the Army, "may correct any military record" of the Army when "necessary to correct an error or remove an injustice." Dela Cruz contends that pursuing such relief would be futile, because, according to a 1951 Corrections Board memorandum, the Corrections Board will not even consider applications for correction submitted by individuals seeking to establish their service in the Philippine military.

After oral argument, we directed the VA to file a response "stating the position of the United States regarding the availability of a remedy from the Army Board for the Corrections of Military Records to correct the Reconstructed Guerilla Roster." *Dela Cruz v. United States*, No. 18-2101 (Fed. Cir. May 7, 2019), ECF No. 55. The VA's response, which is attached as an Addendum to this opinion, stated that the VA had

> consulted with counsel for the Department of the Army and counsel for the Army Review Boards Agency (ARBA), the agency that oversees and administers the [Corrections Board]. Counsel for the ARBA has represented that the board will consider applications filed by purported Filipino Guerillas claiming military service during World War II on behalf of the United States Army, including individuals who are not currently listed on the Reconstructed Guerilla Roster.

Gov't Resp. to Order at 1–2. The VA's response further noted that the Corrections Board will only consider such an application for correction "after the applicant exhausts all other available administrative remedies, including requesting verification of military service from the National Personnel Records Center (NPRC) and the Army Human Resources Command (AHRC)." *Id.* at 2. However, the VA acknowledges that here, Dela Cruz has already exhausted these remedies, as "[t]he NPRC and AHRC have already provided responses unfavorable to Mr. Dela Cruz." *Id.* at 3. Thus, "potential relief is available" to Dela Cruz from the Corrections Board. *Id.; see Soria*, 118 F.3d at 749 ("[I]f the United States service department refuses to verify the applicant's claimed service, the applicant's only recourse lies within the relevant service department, not the VA.").

Under the circumstances, Dela Cruz should promptly file a request with the Corrections Board to have his service recognized by the Army based on his Form 23 affidavit and other available evidence, such as Philippine military documents and affidavits by contemporary witnesses. We expect the Corrections Board will process the request with appropriate dispatch. If the Corrections Board provides relief, we assume that the VA will promptly approve Dela Cruz's claim for payment from the compensation fund.

The question remains whether to affirm the denial of Dela Cruz's claim or to remand to the Veterans Court. We conclude that remand is appropriate because the Veterans Court has exclusive jurisdiction to review a decision by the Corrections Board if the Board denies relief to Dela Cruz. A similar issue has arisen in the context of claims for monetary relief under the Tucker Act, over which the Claims Court (or its predecessor, the Court of Claims) has exclusive jurisdiction. In such cases, the Court of Claims had authority to review relevant decisions by a military corrections board. *See Grieg v. United States*, 640 F.2d 1261, 1265–67 (Ct. Cl. 1981); *Sanders v. United States*, 594 F.2d 804, 812–13 (Ct. Cl. 1979) (en banc), *superseded by statute*

*on other grounds*; *see also Richey v. United States*, 322 F.3d 1317, 1323 (Fed. Cir. 2003). The Supreme Court recognized the appropriateness of such review by the Court of Claims. *Chappell v. Wallace*, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." (citing *Grieg* and *Sanders*)). That authority now rests with the Claims Court. *See Richey*, 322 F.3d at 1323. And if a claimant files suit in the Claims Court in the first instance, rather than first going to the Corrections Board, "that court will require resort to a Corrections Board while the matter remains pending in that court." *Id.*

Here, the situation is similar. Compensation under ARRA § 1002 is determined only by the Secretary for Veterans Affairs. An appeal to the Veterans Court is the exclusive review mechanism for decisions of the Secretary in the administration of VA benefits. *See* 38 U.S.C. §§ 511, 7104, 7252; *In re Russell*, 155 F.3d 1012, 1012–13 (8th Cir. 1998) (per curiam); *Beamon v. Brown*, 125 F.3d 965, 967–71 (6th Cir. 1997); *Larrabee v. Derwinski*, 968 F.2d 1497, 1501 (2d Cir. 1992); *Vincent v. United States*, 731 F. App'x 954, 957 (Fed. Cir. 2018) (explaining that "the Court of Federal Claims lacks jurisdiction to hear a claim for benefits under Section 1110 or comparable Title 38 provisions" because such a claim "must proceed through the statutorily prescribed route of review . . . a route that runs through the Court of Appeals for Veterans Claims"). Since the Veterans Court has exclusive jurisdiction to review the right to compensation under ARRA § 1002 and to review relevant decisions from the Corrections Board, we remand to the Veterans Court to hold the case in abeyance pending proceedings at the Corrections Board—a procedure identical to that followed by the Claims Court in cases arising under the Tucker Act. *See Richey*, 322 F.3d at 1323.

CONCLUSION

We conclude that the VA can properly rely on the Army's certification as to service, but it cannot rely simply on the Army's determination that the veteran's name does not appear on the reconstructed roster without giving the veteran a meaningful opportunity to challenge his service record. Based on the government's representation that the Corrections Board will consider requests for correction by individuals who are not listed on the reconstructed roster, we conclude that Dela Cruz's proper recourse is to challenge the Army's determination based on the reconstructed roster before the Corrections Board. We trust that the Corrections Board will act promptly on requests by Filipino veterans such as Dela Cruz, particularly given the long procedural history of such claims and the fact that most World War II veterans are now over 90 years old. The case is remanded to the Veterans Court to hold the case in abeyance pending consideration by the Corrections Board. The mandate shall issue forthwith.

**AFFIRMED-IN-PART AND REMANDED**

COSTS

No costs.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

| | | |
|---|---|---|
| EDDIE N. DELA CRUZ, | ) | |
| | ) | |
| Claimant-Appellant, | ) | |
| | ) | No. 2018-2101 |
| v. | ) | |
| | ) | |
| ROBERT WILKIE, | ) | |
| Secretary of Veterans Affairs, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

## RESPONDENT-APPELLEE'S RESPONSE
## TO THE COURT'S MAY 7, 2019 ORDER

Respondent-appellee, Robert Wilkie, Secretary of Veterans Affairs,

respectfully submits this response to the Court's May 7, 2019 order (ECF No. 55),

directing the Secretary to address the availability of a remedy from the Army

Board for Correction of Military Records (ABCMR or board) to correct the

Reconstructed Guerilla Roster for applicants who challenge their exclusion from

the roster, which, in part, determines eligibility for payment from the Filipino

Veterans Equity Compensation Fund.

Undersigned counsel has consulted with counsel for the Department of the

Army and counsel for the Army Review Boards Agency (ARBA), the agency that

oversees and administers the ABCMR. Counsel for the ARBA has represented

that the board will consider applications filed by purported Filipino Guerillas

claiming military service during World War II on behalf of the United States Army, including individuals who are not currently listed on the Reconstructed Guerilla Roster.

Pursuant to 10 U.S.C. § 1552(a)(1), the Secretary of the Army, acting through the ABCMR, "may correct any military record of the [Army] when the Secretary considers it necessary to correct an error or remove an injustice." Accordingly, relevant to the Court's directive, an individual attempting to establish eligible Philippine military service, as defined in the American Recovery and Reinvestment Act of 2009, may file an application and supporting documents with the ABCMR for consideration. The ABCMR will consider applications for correction only after the applicant exhausts all other available administrative remedies, including requesting verification of military service from the National Personnel Records Center (NPRC) and the Army Human Resources Command (AHRC).

The ABCMR review process is the highest level of administrative appeal and provides the final decision on behalf of the Army. If the ABCMR denies the requested relief, the applicant may file an application for reconsideration or seek judicial review. Army Reg. No. 15-185, § 2-15 (rule governing requests for reconsideration); *Chappell v. Wallace*, 462 U.S. 296, 303 (1983) ("Board [for

2

Correction of Military Records] decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence.").

At this stage, the ABCMR is the only remedy available to Mr. Dela Cruz to change the status of his military service. The NPRC and AHRC have already provided responses unfavorable to Mr. Dela Cruz when the Department of Veterans Affairs (VA) requested service verification from those agencies. Appellee Br. 3-4, ECF No. 38. As we stated in our response brief in this appeal, VA takes no position on whether Mr. Dela Cruz would be successful in pursuing relief at the ABCMR, but potential relief is available. *Id.* at 36-37. Regardless of the potential outcome at the ABCMR, this Court is not the proper forum to resolve Mr. Dela Cruz's dispute concerning recognition of his military service. *See Soria v. Brown*, 118 F.3d 747, 749 (Fed. Cir. 1997) ("[I]f the United States service department refuses to verify the applicant's claimed service, the applicant's only recourse lies within the relevant service department, not the VA."); *Go v. Shinseki*, 517 Fed. Appx 941, 942 (Fed. Cir. 2013) (concluding that claimant's "recourse is under 10 U.S.C. § 1552, not with this Court").

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

3

OF COUNSEL:
BRIAN D. GRIFFIN
Deputy Chief Counsel


BRANDON A. JONAS
Attorney
Benefits Law Group
Department of Veterans Affairs
810 Vermont Ave., NW
Washington, DC  20420

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Jana Moses
JANA MOSES
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, NW
Washington, DC  20530
Tel: (202) 616-2279

May 23, 2019

Attorneys for Respondent-Appellee